Filed 10/21/25  P. v. Jackson CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>CLINTON JACKSON,<br><br>　　　Defendant and Appellant. | A170645<br><br>(San Mateo County<br>Super. Ct. No. 24-SF-000967-A) |

A jury convicted Clinton Jackson of four counts of making criminal threats aboard an Amtrak bus.  (Pen. Code, § 422.)[1]  On appeal, Jackson contends (1) there was insufficient evidence to support two of the criminal threats convictions; and (2) the trial court prejudicially erred by instructing the jury on the corpus delicti rule.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Evidence at Trial

**Bus Driver N.V. (Count 1)**

N.V. regularly drove the Amtrak bus route from Oakland to Santa Barbara.  On December 29, 2023,[2] N.V. was driving the bus from Emeryville

_____

[1] All further undesignated statutory references are to the Penal Code.

[2] All relevant facts occurred on December 29, 2023.

1

to San Francisco while on route to Santa Barbara, when he heard Jackson speaking loudly to someone on the phone in an "[a]gitated" and "aggressive" manner. Jackson was seated three rows behind N.V., and N.V. became concerned because he overheard Jackson threatening to kill a family member and threatening "to kill people on the bus." N.V. heard Jackson say, " 'I'm going to kill him. I know he's my brother, I will kill him.' " N.V. assumed Jackson was talking to his mother because he said, " 'I know, mom.' " N.V. continued driving to San Francisco. As he heard Jackson's voice become more "agitated" on the phone, N.V. called 911. The 911 dispatcher instructed N.V. to avoid contact with Jackson as the authorities tried to determine the location of the bus. N.V. continued to watch Jackson and other passengers through his rearview mirror. He saw several passengers move away from Jackson. Jackson was moving around the bus, approaching N.V. and other passengers. Jackson told N.V. to pull over so the passengers could get food. Jackson appeared "[e]rratic, and confused."

When Jackson demanded that N.V. pull over, N.V. told him he was speaking with his manager. He did not want to alert Jackson that he was talking to the police because he was "scared" about the passengers' safety and his own safety. N.V. noticed that there were two young women seated behind him. When he eventually stopped the bus, the young women were scared and crying.

N.V. feared for his life during the incident. He was unsure if Jackson had any weapons or if he was going to approach him and hinder his driving. He was also afraid for the passengers' safety if he got hurt, stating, "If something happens to me something happens to them." N.V. felt responsible for their safety and was concerned that Jackson could carry out the threats he was making to the passengers. N.V. did not want to pull over until the

2

situation felt safe.  At some point, N.V. pulled over near San Mateo as instructed by the 911 dispatcher.

It was about an hour from the time Jackson first made a concerning statement about killing people on the bus to the time the police intervened. Once the police removed Jackson from the bus, N.V. was no longer in fear and continued driving the bus.

### Passenger S.P.  (Count 2)

Eighteen-year-old S.P. and her roommate M.S. boarded an Amtrak bus in San Francisco headed to Santa Barbara.  They were seated in the front of the bus.  Two people who were seated directly behind them began arguing but S.P. could not hear exactly what they were saying.  One of the individuals, later identified as Jackson, moved to the seat next to S.P. Jackson then started talking to the bus driver and telling him to take the next exit.  Jackson was "angry" and spoke in an "urgent and serious" tone.

Jackson paced while raising his voice to the driver and to the other passengers on the bus.  He was "shouting" and saying that he "would turn the bus from zero to a hundred real quick" if the driver did not take the next exit.  S.P. understood that to mean that Jackson was going to hurt people on the bus.  Jackson also said that if "anybody called the police . . . they would be dead before the police picked up."  When the bus driver got on the phone, Jackson asked if he was talking with the police.  The bus driver said he was on the phone with his manager and asked Jackson why he was "holding" them "hostage."  Jackson turned to the passengers and asked if anybody felt like they were being held hostage.  He appeared to be "high energy" and "angry."  Jackson said he was sorry that everybody on the bus had to die "because of this man," referring to the person on the bus with whom he was arguing.

3

While Jackson was pacing, he said he had a "banger" on him.  S.P. took that to mean Jackson had a gun.  The bus eventually pulled over to the side of the freeway.  The police entered the bus and removed Jackson.  The incident lasted around 30 minutes.  During that time, S.P. feared for her life and was "scared" that she "might be shot."

**Passenger M.S. (Count 3)**

M.S. was seated with S.P. in the first two seats directly behind the bus driver.  Jackson was in the seat behind M.S., when he started arguing with another person.  The argument escalated when Jackson said, " 'you have your hand on a gun, I have my hand on my gun, too.' "~(RT 132)~  Jackson repeatedly said, " 'shoot me, shoot me.  I'm not afraid to die.  I've been to prison before.  Shoot me.' "  The man with whom Jackson was arguing moved to the seat across the aisle from M.S.  The man told the bus driver he was trying to sleep and asked if he could get Jackson, whom he referred to as "this man" off "me."  Jackson got up, stood in the aisle, and told the bus driver, " 'I'm so sorry' . . . 'keep driving the bus.  This is between us.' "  Jackson went back to his seat and then started pacing, repeatedly saying he was going to kill everyone.  Jackson said, " 'I'm sorry that you all have to die because of the actions of this man.' "  Jackson kept saying everyone was "going to die."  Jackson "was on the phone and said that whoever he was on the phone with was going to come shoot up the bus in San Jose."  As he was walking up and down the aisle, Jackson was "yelling" at everyone that "the whole bus" was "going to die."

Jackson turned to the bus driver and told him to take the next exit because the person who was going to shoot up the bus was meeting them there.  When the bus driver said he could not take the next exit, Jackson said, " 'You know I have a Glock on me, right?  Take the next fucking exit.' "

4

At some point, M.S. heard the bus driver speaking to the police on the phone saying that someone on the bus was threatening to kill all the passengers. Jackson told the bus driver to get off the phone with the police and to take the next exit. The bus driver said he was on a call with his manager. M.S. heard the bus driver say that people on the bus were being held hostage. Jackson responded, " 'I'm not holding anyone hostage[,]' " then he turned to the passengers and asked, " 'Does anyone feel like I'm holding them hostage right now?' "

At one point, Jackson told the bus driver to let the women and children off the bus so they could go to a restaurant and eat, and that "the men could handle it." He also made a comment that " 'I hope you all survive because [you're] going to get shot up' " and " 'no one is going to survive this.' " When passengers said they would call the police, Jackson responded " 'call the police, you'll be dead before . . . they pick up.' "

About 30 minutes later, the bus driver stopped the bus and the police arrived. The police boarded the bus and asked Jackson if he had a weapon. Jackson initially denied having a weapon but later admitted he had one. The police removed Jackson from the bus.

During the incident, M.S. was scared and feared for her life. She did not know if the situation was going to escalate but was scared she was going to be killed. M.S. was still in fear even after the police removed Jackson from the bus because of the threat that the bus was going to be shot up in San Jose.

**Passenger T.T. (Count 5)**

T.T. boarded the bus in San Francisco around 10:50 p.m. Jackson was speaking loudly and shouting at times. T.T. was seated at the back of the bus and Jackson was close to the front of the bus near the driver. Jackson was

standing for most of the time.  Jackson appeared to be "a little unhinged," "[f]rustrated", and "angry" at times.  T.T. "clearly" heard him say to someone that "they were jeopardizing the lives of females on the bus."  T.T. had been on the phone with her boyfriend but switched to text messages because she did not want "to bring attention" to herself.  Jackson had been "speaking openly . . . towards other people on the bus."  T.T. did not want Jackson "to address" her or see her as a "target".

Jackson was moving around the bus and it did not appear that he was speaking to just one person.  Speaking loudly, Jackson repeatedly told the bus driver "next exit," directing the bus driver to take the next exit.  Jackson "was definitely loud" and "frustrated at the same time."

T.T. became scared after she heard Jackson make the statement about female passengers' lives being in jeopardy.  She thought Jackson could be targeting women on the bus and might have a weapon.  T.T. was scared for her life and for her safety.

The police intervened within 30 minutes.  She continued to be fearful even after the officers arrived.  T.T. was less scared once Jackson was removed from the bus.

**Police Intervention**

California Highway Patrol Officer Thomas Stewart boarded the bus and detained Jackson.  Jackson appeared to be intoxicated based on objective signs, including the odor of alcohol on his person, red watery eyes, unsteady gait, slurred speech, and his agitated demeanor.  Jackson admitted to the officer that he had consumed alcohol.  Jackson was placed under arrest.  When asked if he had "any kind of items on him," Jackson said he had a box cutter in his pocket.  Jackson was searched and a box cutter was found in the right front pocket of his pants.  Another box cutter was located in Jackson's

6

bag. At trial, Officer Stewart displayed a box cutter similar in size as the one found on Jackson and demonstrated that the blade extended a quarter inch when exposed.

## DISCUSSION

Jackson contends there is insufficient evidence to support his convictions on counts 1 and 5. He further contends the trial court prejudicially erred in instructing the jury on the corpus delicti rule. Both contentions are meritless.

### A. Substantial Evidence Supports Jackson's Convictions on Counts 1 and 5

N.V. and T.T. were named as victims in two criminal threats counts. Count 1 (N.V.) was based on Jackson's statement that he was going to "kill everyone on the bus," while count 5 (T.T.) was based on Jackson telling "someone that they were jeopardizing the lives of the females on the bus." Jackson contends there was insufficient evidence to establish his comments were criminal threats in violation of section 422.

Our Supreme Court has divided the crime of criminal threats into five constituent elements: To show a criminal threat pursuant to section 422, the prosecution must prove " '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat—which may be "made verbally, in writing, or by means of an electronic communication device"—was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained

7

fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.'" (*In re George T.* (2004) 33 Cal.4th 620, 630; see also CALCRIM No. 1300.[3])

Jackson's appeal is limited to the third element of the offense,[4] i.e., that the threat "on its face and under the circumstances in which it [was] made . . . [was] so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat." (§ 422.) "'To constitute a criminal threat, a communication need not be *absolutely* unequivocal, unconditional, immediate, and specific. The statute includes the qualifier "so" unequivocal, etc., which establishes that the test is whether, in light of the surrounding circumstances, the communication was *sufficiently* unequivocal, unconditional, immediate, and specific as to convey to the victim a gravity of

---

[3] The jury here was instructed with CALCRIM No. 1300, which read, in part, as follows: "The defendant is charged in Counts 1, 2, 3, and 5 with having made a criminal threat in violation of Penal Code section 422. To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to 1) [N.V.] 2) [S.P.], 3) [M.S.], 5) [T.T.]; [¶] 2. The defendant made the threat orally; [¶] 3. The defendant intended that his statement be understood as a threat; [¶] 4) Under the circumstances, the threat was so clear, immediate, unconditional, and specific that it communicated to each individual alleged a serious intention and the immediate prospect that the threat would be carried out; [¶] 5) The threat actually caused each alleged victim to be in sustained fear for their own safety; [¶] AND [¶] 6. each alleged victim's fear was reasonable under the circumstances."

[4] Presumably relying on CALCRIM No. 1300, the People refer to this element as the "fourth" element; throughout this opinion, we adhere to the enumeration devised by our Supreme Court and refer to the challenged element as the "third" element.

purpose and immediate prospect of execution.' [Citation.] '[W]hether the words were sufficiently unequivocal, unconditional, immediate and specific they conveyed to the victim an . . . immediate prospect of execution of the threat can be based on all the surrounding circumstances and not just on the words alone.' [Citation.] '[I]t is the circumstances under which the threat is made that give meaning to the actual words used. Even an ambiguous statement may be a basis for a violation of section 422.' [Citation.] The [trier of fact] is 'free to interpret the words spoken from all of the surrounding circumstances of the case.' " (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1433.)

Jackson argues N.V. and T.T. "did not perceive any words that constituted a threat to commit a crime or words that were so unequivocal, unconditional, immediate and specific as to convey to them a gravity of purpose and an immediate prospect of execution of the threat." Jackson contends N.V. only overheard him talking on the phone threatening to kill a family member. As such, he insists the alleged threat of harm was not specifically directed at N.V. Similarly, Jackson argues his statement heard by T.T. that "they were jeopardizing the lives of females on the bus" did not refer to Jackson's own intended actions of harming anyone but merely suggested some *other* person was putting the lives of women at risk. According to Jackson, the purported threats were at best facially ambiguous and did not satisfy the third element of the offense. But this argument ignores the circumstances in which these statements were made.

As driver and passenger, N.V. and T.T. were effectively captive on the bus as it was proceeding on the freeway when they experienced Jackson's threats. They both witnessed Jackson engaging in erratic behavior, pacing the bus, shouting, and angrily making threats and demands. N.V. heard

9

Jackson on the phone threatening to kill a family member and to kill "people on the bus." N.V. continued to observe Jackson and his interactions with passengers by looking in his rearview mirror. He saw other passengers moving away from Jackson. Jackson repeatedly ordered N.V. to pull the bus over and to take the next exit off the freeway. Concerned that Jackson would harm him and the passengers, N.V. called 911 surreptitiously and continued driving the bus route. He believed that pulling over the bus as demanded by Jackson would have endangered the lives of everyone on the bus. Based on the relevant surrounding circumstances, Jackson's threat that he would kill people on the bus included N.V. The threat was clear, immediate, unconditional, and specific, and communicated to N.V. a gravity of purpose and the immediate prospect that the threat would be carried out.

T.T. testified Jackson appeared to be a "little unhinged," frustrated, and angry. When she heard Jackson say to someone that "they were jeopardizing the lives of females on the bus," she immediately became afraid for her own safety. She stopped talking to her boyfriend on the phone and switched to text messages to avoid drawing attention to herself. T.T. explained Jackson "seemed like he was speaking openly . . . towards other people on the bus" and she did not want him to "see" her "as a target, as well as the comment" she "heard which sounded threatening in regards to jeopardizing [the] lives of females on the bus." Again, the circumstances under which the threats were made gave meaning to the words Jackson used. (See *People v. Butler* (2000) 85 Cal.App.4th 745, 753 ["the meaning of the threat . . . must be gleaned from the words and all of the surrounding circumstances"].) T.T. saw Jackson moving around the bus and speaking to more than one person. T.T. was afraid and unsure if Jackson was under the influence or if he might brandish a weapon. She became even more

10

concerned about the seriousness of the threat when she heard Jackson repeatedly demand that the bus driver take the next exit. In this context, Jackson's statement about the lives of females on the bus being in jeopardy conveyed to T.T. that he may be targeting females—including her.

The language of the threats and the circumstances in which Jackson made them reasonably conveyed to both N.V. and T.T. that he was making true threats and that they were going to be carried out imminently. Indeed, Jackson's volatility, displayed in a confined space, made the threats more real. (See *People v. Choi* (2021) 59 Cal.App.5th 753, 762 [defendant's "pattern of erratic and threatening behavior" made his threat "an unambiguous threat of harm"]; *People v. Wilson* (2010) 186 Cal.App.4th 789, 808 [trier of fact may consider " 'the defendant's mannerisms, affect, and actions involved in making the threat as well as subsequent actions taken by the defendant' "].)

Substantial evidence supported Jackson's convictions in counts 1 and 5.

### B. Giving the Corpus Delicti Instruction Was Harmless Error

Jackson contends the trial court prejudicially erred in instructing the jury with CALCRIM No. 359, the corpus delicti rule.[5] He argues the instruction confused the jury and lowered the prosecution's burden of proof. Respondent asserts Jackson forfeited this claim by not raising it below; alternately, respondent argues any error was harmless. We conclude

---

[5] The corpus delicti rule rests on the principle that the prosecution cannot prove the body of the crime, "i.e., the fact of injury, loss, or harm and the existence of a criminal agency as its cause," by exclusive reliance on the defendant's extrajudicial statements. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168–1169 (*Alvarez*).)

Jackson's claim fails on its merits, even assuming it was adequately preserved.

*1. Additional Background*

During a pre-deliberation instruction conference, the court indicated it would give, at the prosecution's request, CALCRIM No. 358, the cautionary instruction regarding statements made by Jackson, and CALCRIM No. 359, the corpus delicti instruction.

As given, CALCRIM No. 358 read: "You have heard evidence that the defendant made statements before the trial. You must decide whether the defendant made any of these statements, in whole or in part. If you decide that the defendant made such statements, consider the statements, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statements. [¶] Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded."

As given, CALCRIM No. 359 read: "The defendant may not be convicted of any crime based on his out-of-court statements alone. You may rely on the defendant's out-of-court statements to convict him only if you first conclude that other evidence shows that the charged crime was committed. [¶] That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. [¶] This requirement of other evidence does not apply to proving the identity of the person who committed the crime. If other evidence shows that the charged crime was committed, the identity of the person who committed it may be proved by the defendant's statements alone. [¶] You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

The trial court also instructed the jury several times that the

12

prosecution was required to prove Jackson's guilt beyond a reasonable doubt. (CALCRIM Nos. 220, 224, 225, 300, 3426.)

Then, during deliberations, in response to two questions from the jury, the court once again advised the jury that the prosecution had the burden of proving its case beyond a reasonable doubt. Specifically, the jury asked, "Does a threat need to be directed to a specific individual to meet element 1 [of section 422] or any other element." The court advised the jury, "Each count alleges a separate victim. It is up to the jury to decide if the People have proven each element beyond a reasonable doubt for each victim/each count." The jury also asked, "What does the District Attorney's burden of proof include when it comes to intent?" (Orig. capitalization omitted.) In pertinent part, the court responded, "The People's burden of proof for all elements of the charges is proof beyond a reasonable doubt."

*2. Analysis*

" 'It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions.' [Citation.] When a defendant claims an instruction was subject to erroneous interpretation by the jury, [the defendant] must demonstrate a reasonable likelihood that the jury misconstrued or misapplied the instruction in the manner asserted. [Citation.] In determining the correctness of jury instructions, we consider the entire charge of the court, in light of the trial record." (*People v. Covarrubias* (2016) 1 Cal.5th 838, 926.)

As given, CALCRIM No. 359 correctly sets forth the corpus delicti rule, instructing the jury it cannot base a conviction on a defendant's out-of-court statement alone. (*People v. Ledesma* (2006) 39 Cal.4th 641, 721.) Rather, the prosecution must prove a crime actually occurred apart from any of the defendant's out-of-court statements. (*Alvarez, supra*, 27 Cal.4th at pp. 1168–

13

1169.)  "The independent proof [of the corpus delicti] may be circumstantial and need not be beyond a reasonable doubt." (*Id.* at p. 1171.)  "In every case, once the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues." (*Ibid.*)

It is error to give an instruction that correctly states a principle of law but has no application to the facts of the case.  (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)  But if this is the only error, it is one of state law subject to the test articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Guiton, supra*, at pp. 1129–1130.)  "[S]uch an error is usually harmless, having little or no effect 'other than to add to the bulk of the charge.' [Citation.]  There is ground for concern only when an abstract or irrelevant instruction creates a substantial risk of misleading the jury to the defendant's prejudice." (*People v. Rollo* (1977) 20 Cal.3d 109, 123, superseded by constitutional amendment on another ground as stated in *People v. Castro* (1985) 38 Cal.3d 301, 307–308.)  To determine whether the corpus delicti instruction misled or confused the jury, we consider whether there was any reasonable likelihood the jury would have misunderstood the instruction. (*People v. Foster* (2010) 50 Cal.4th 1301, 1345.)

The cautionary instruction of CALCRIM No. 358 applies to "any extrajudicial oral statement by the defendant that is used by the prosecution to prove the defendant's guilt—it does not matter whether the statement was made before, during, or after the crime, whether it can be described as a confession or admission, or whether it is a verbal act that constitutes part of the crime or the criminal act itself." (*People v. Diaz* (2015) 60 Cal.4th 1176, 1187.)  The cautionary instruction " 'is designed to aid the jury in determining whether an admission or confession was in fact made.' " (*Id.* at

14

p. 1185.) By contrast, the corpus delicti rule of CALCRIM No. 359 applies to inculpatory extrajudicial statements, such as confessions, admissions, and preoffense statements of intent. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1431; *Alvarez, supra*, 27 Cal.4th at pp. 1168–1169; *People v. Carpenter* (1997) 15 Cal.4th 312, 394, abrogated on other grounds by *People v. Diaz, supra*, 60 Cal.4th at pp. 1189–1190.) "However, the corpus delicti rule has no application when the defendant's extrajudicial statements constitute the crime." (*People v. Chan* (2005) 128 Cal.App.4th 408, 420.)

Because Jackson's statements on the bus were the essential basis of the crimes with which he was charged they were not within the ambit of the corpus delicti rule. (*People v. Chan, supra*, 128 Cal.App.4th at p. 420.) Nor did they constitute admissions, confessions, or preoffense statements of intent. The People do not argue otherwise.[6] The trial court thus erred in giving the corpus delicti instruction.

Nevertheless, we reject Jackson's contention that CALCRIM No. 359 lessened the prosecutor's burden of proof. (See *People v. Rivas, supra*, 214 Cal.App.4th at p. 1431.) The jury was instructed in at least five separate instructions that it could not convict Jackson unless the People had proven his guilt beyond a reasonable doubt. (CALCRIM Nos. 220, 224, 225, 300, 3426.) Also, in response to two questions from the jury, the court reiterated the prosecution had the burden of proving its case beyond a reasonable doubt. We presume the jury followed these instructions. (*People v. Smith* (2007)

---

[6] Similarly, Jackson's statements to the arresting officer that he had been drinking and had box cutter in his pocket did not meet the criteria of the corpus delicti rule. Although the jury could still consider with caution Jackson's statements that he consumed alcohol and had a box cutter (CALCRIM No. 358), they were not subject to the corpus delicti rule. (See *People v. Carpenter, supra*, 15 Cal.4th at p. 394.)

40 Cal.4th 483, 517.)

We also reject Jackson's claim that the instruction was unduly confusing. CALCRIM No. 359 accurately instructs jurors that they must find other independent evidence that supports the charged crime was committed, however slight, before it may consider a defendant's extrajudicial statements. (*Alvarez*, *supra*, 27 Cal.4th 1171; *People v. Reyes* (2007) 151 Cal.App.4th 1491, 1498.) There is no danger a jury will be unable to differentiate between the "slight evidence" standard and the prosecution's burden of proving its case beyond a reasonable doubt. (See *People v. Rosales* (2014) 222 Cal.App.4th 1254, 1260; see also *People v. Reliford* (2003) 29 Cal.4th 1007, 1016 [jurors are often asked to apply differing standards of proof].) In addition, CALCRIM No. 359 concludes by instructing the jury that the defendant may not be convicted unless the prosecution proves guilt beyond a reasonable doubt. We find there "was no reasonable likelihood the jury was confused and misapplied the instruction." (*Rosales*, at p. 1261.)

Finally, there is no reasonable probability that the jury would not have convicted Jackson in the absence of the corpus delicti instruction. Four witnesses testified about Jackson's alarming and erratic behavior aboard the bus. Jackson repeatedly threatened that the bus was going to get "shot up" and that everyone was going to die, he remarked that the lives of females on the bus were in jeopardy, and he placed the safety of everyone at risk by demanding that the driver pull over and exit the freeway. The evidence at trial supported the conclusion that Jackson intended his statements to be understood as threats, the threats communicated a serious and immediate prospect of being carried out, and the threats caused each victim to be in sustained fear for their own safety.

On this record, there is no reasonable probability the jury would have

reached a result more favorable to Jackson had the trial court not given CALCRIM No. 359.  Thus, the error was harmless.

## DISPOSITION

The judgment is affirmed.

_____

Humes, P.J.


WE CONCUR:



_____

Langhorne Wilson, J.



_____

Smiley, J.


*People v. Jackson* A170645

18